## TRIUMPH TRAP CO., Inc., v. ONEIDA COMMUNITY CO., Limited.

(District Court, N. D. New York.  February 27, 1922.)

1. **Patents ⬤236—Mere change of form does not avoid infringement.**
   A mere change of form of a mechanical structure, which retains the mode of operation and accomplishes the same result as the patented device, does not avoid infringement.

2. **Patents ⬤72—Device not designed for, and requiring modification to accomplish, purpose of patented device, not anticipation.**
   It is not sufficient to constitute anticipation that the device relied on might by modification be made to perform the function of the patented device, if it was not designed by its maker, nor adapted nor actually used for the performance of such function.

3. **Patents ⬤328—1,238,525, for trap spring, claim 2, held valid and infringed.**
   The Kinsley patent, No. 1,238,525, claim 2, for a spring for a game trap, *held* not anticipated, valid, and infringed.

In Equity.  Suit by the Triumph Trap Company, Inc., against the Oneida Community Company, Limited.  Decree for complainant.

H. C. Sholes, of Utica, N. Y. (Charles H. Wilson, of New York City, of counsel), for plaintiff.

Charles B. Mason, of Utica, N. Y. (Harry L. Duncan, of Ridgewood, N. J., of counsel), for defendant.

COOPER, District Judge.  This suit is brought by the Triumph Trap Company as assignee of the Kinsley patent, No. 1,238,525, to enjoin the Oneida Community Company, Limited, from infringing the patent, and for an accounting.  This patent, issued August 28, 1917, is for an obliquely upbent, U-shaped spring for a game trap.  The upper leg of the spring is adapted to engage the jaws of the trap and operate them.  The jaws of the trap are hinged to the trap base, to which the lower leg of the spring is also attached.  The end portion of the upper or free leg of the spring is bent obliquely upward away from the lower leg of the spring and out of the plane of the remainder of the upper leg.  This oblique upward bend makes it possible to swing the trap spring to the left as well as to the right of its straight position in line with the trap base, without materially raising the left or free jaw of the trap above the level of the locked or right jaw of the trap. In other words, this spring, as described in the patent, gives the trap a left-hand as well as a right-hand "set."  The traps made and sold by the plaintiff with this patented spring were apparently the first successful commercial traps which had both left as well as right hand set.

The only claim of the patent involved in this suit is claim 2, which is as follows:

"A spring for animal traps comprising a member bent upon itself into U-shape, the end portion of one leg of the spring being adapted to engage the jaws of the trap for operating said jaws, and the said end portion being bent upwardly, obliquely away from the second leg out of the plane of the remainder of the first leg."

The defendant sets up four separate defenses, any one of which, if properly proved, is a complete bar to this litigation.  The defenses

are: (1) Even if claim 2 is valid, it does not cover the defendant's Victor Giant trap spring. (2) The defendant anticipated the patent by the sale of traps having similar springs more than two years before the application for the patent in suit. (3) The claim is invalid because of public use and sale of his springs by the patentee Kinsley more than two years before the filing of the application. (4) The patent is anticipated by the prior art.

These defenses will be considered in their order. Defendant's first claim (1) is that its Victor Giant springs are not covered by the patent. The defendant concedes that its Victor Giant springs are upbent and side-twisted (obliquely upbent). But defendant contends that the upper leg of its Victor Giant springs is side-twisted considerably more than it is upbent, so that the spring bend is located within and cuts across the plane of the remainder of the upper spring leg; that the low side of the bent portion of the upper leg is carried down considerably below the plane of the body of the upper leg, while the high side of the bent portion of the upper spring is above this plane, and that its spring is therefore outside the patent. This means in substance that the bending in defendant's springs is not at the same place as in the springs of the patent, and is of different position with reference to the plane of the upper leg of the spring. It can be plainly seen from the inspection of the defendant's trap that the upper leg of the spring is bent upwardly, obliquely away from the second or lower leg of the spring, and that the bending extends over a greater area of the upper leg of the spring than does the bending of the plaintiff's spring, and also that there is a downward bend at one portion of the upper leg.

[1] It may be conceded that the bend of defendant's spring is as claimed by it. This bending of the defendant's spring, differing, as above stated, from the bending of plaintiff's patent spring, nevertheless accomplishes the same desired result of giving the left-hand set. This difference of the bending is a mere mechanical change of form or location of the bend and does not enable the defendant to escape infringement on its Victor Giant traps. The defendant's spring is covered by the patent. Reece Buttonhole Machine Co. v. Globe Buttonhole Machine Co., 61 Fed. 958, 10 C. C. A. 194; Parsons v. Seelye, 100 Fed. 455, 40 C. C. A. 486; Dowagiac Mfg. Co. v. Minn. Moline Plow Co., 118 Fed. 136, 55 C. C. A. 86; Guidet v. Brooklyn, 105 U. S. 550, 552, 26 L. Ed. 1106; Winans v. Denmead, 15 How. 330, 14 L. Ed. 717.

Defendant's next defense (2) is public sale by the defendant of a trap having a spring similar to the spring of the patent in suit, more than two years before the date of the filing of the application, to wit, August 2, 1916. The evidence on this point consists mostly of testimony of employees of defendant and certain so-called sand blast springs taken from the defendant's museum, made in 1912. These sand blast springs are claimed to be a part of about 7,000,000 made yearly by defendant at that time. Great weight cannot be attached to the testimony of interested witnesses who are relying chiefly on their memory of happenings years before, or where a material portion of the testimony seems improbable. If there had been any such quantity of traps containing such springs sold by the defendant, as contended

by it, it would have been a relatively simple matter to have produced several traps with springs so constructed and sold, and disinterested witnesses to testify to the purchase or sale and use. The evidence upon the subject of public sale by the defendant is somewhat contradictory, and is not so specific and clear as would warrant overriding the patent on the strength of it under the requirement for proof beyond a reasonable doubt. This defense must be overruled. Barbed Wire Patent Case, 143 U. S. 275, 284, 12 Sup. Ct. 443, 36 L. Ed. 154; Adamson v. Gilliland, 242 U. S. 350, 37 Sup. Ct. 169, 61 L. Ed. 356.

Defendant's defense (3) of public sale and use by Kinsley more than two years before the filing of his application for patent is more troublesome. Undoubtedly the plaintiff company, with which Kinsley was connected, had sold thousands of traps in 1913 and 1914, all of which had a U-shaped spring. The defense asserts, and has offered numerous witnesses in its effort to establish its contention that many of these springs had the oblique upbend, or the upbend and side twist, of the spring in suit.

Two witnesses are offered, Hughes and Montague, who were engaged by the defendant to purchase traps of plaintiff's manufacture, and who did produce two No. 1½ traps which they claim to have purchased early in 1914. The pan of one of these has the initial "T" stamped thereon; the other has no marking. The end of the free leg of the spring of each trap is slightly upbent, but the characteristic side twist of the spring of the patent is apparently absent. These are apparently traps containing springs made and put out before the oblique upbend was made in the upper leg of the trap spring. These two traps, therefore, are not sufficient to establish this defense.

Defendant's counsel has ably marshaled another set of witnesses, nearly all of whom were employees in the plaintiff's factory prior to August 2, 1914, the commencement of the two-year period before the application for the patent. Several of them were employed by the defendant at the time of the trial. These witnesses told of the manufacture of springs and traps in the plaintiff's factory during their employment there. Their testimony relates chiefly to the No. 0 and No. 1 traps of plaintiff's manufacture. It appears that preparations for turning out of these traps were completed prior to or about October, 1913. While some of these witnesses talked in a general way about a side twist as well as upbend in the springs, then made, it was not clear that any such side twist on any particular spring was anything more than an accidental happening, the effect of which on the set of the trap was unknown, and with the exception of the witness Kelley, practically all of them said that at the time as to which they were testifying, they had never heard of a trap in which such a spring could be turned toward the left or free jaw (left set) without "camming" up the free jaw, or, in other words, without raising it out of the plane of the set jaw. The whole purpose of the patent in suit was to enable the handle of the spring to be turned toward the left, or free jaw, and thereby give the trap a left set, without such "camming" up. The testimony of most of the witnesses on cross-examination is illustrated by that of the witness Collins, who was employed by the plaintiff com-

pany for about a year and a half commencing in the summer of 1913. His testimony is as follows:

"Q. Now, Mr. Collins, would you mean by letting this free leg lie proper so when the spring was turned toward the set jaw in that position? A. Yes.

"Q. About that position? A. Yes.

"Q. That is turned in the direction of the fast jaw; isn't that true? A. Yes; or when it is straight.

"Q. Or when it is straight, it lies down? A. Yes.

"Q. Nothing was said at that time about turning toward the free jaw, was there? A. I don't remember any.

"Q. Never heard of such a thing at that time, did you? A. I don't remember as I do.

"Q. When did you leave the company? A. I worked for them about a year and a half.

"Q. Yes; and when did you leave? A. The last of 1914. * * *

"Q. But you never heard during all that time of it being possible to turn the spring toward the free jaw and let it remain flat; is that true? A. I never heard of it."

The witness Kelley, who worked for the plaintiff company a short while commencing in June, 1914, and who was employed by the defendant at the time of the trial, testified that the springs of the No. 0 and No. 1 traps did turn to the left or free jaw without "camming" it or raising it up. This witness had been discharged by the plaintiff some time after he entered their employ, but could not remember the cause of his discharge. It is hardly probable that he could remember any more accurately about so small a matter as the side twist of this spring at a time when there was no patent, and no litigation regarding the spring, and, so far as he knew, no thought of any.

Concededly plaintiff sold thousands of traps during the latter part of 1913 and in 1914 before August 2, the date two years prior to the application. If these traps contained springs with this oblique upbend, as defendant contends, it would seem that the defendant, with its presumably efficient selling and administrative force, could have obtained a considerable number of these traps with these oblique upbent springs, and could have produced them at the trial, or at least that defendant could have produced many disinterested dealers or users to so testify.

It is not without significance that the literature which plaintiff put out during this period of 1913 and 1914 to sell its traps contained no reference or suggestion to the effect that the traps it was then making had this left-hand set, or, in other words, had this obliquely upbent spring, which would give the trap the left-hand set, without raising or "camming" up the free jaw. Plaintiff's literature to the trade since the time of the patent is replete with exposition of this new feature of plaintiff's trap and the great improvement in traps thereby created. Though defendant has labored ably and diligently to establish prior sale by the plaintiff of traps with the spring like that described in the patent in suit, this court feels constrained to hold that this defense has not been established beyond a reasonable doubt, as the law requires, by the evidence in the case. Daniel Green Felt Shoe Co. v. Dolgeville Felt Shoe Co., 210 Fed. 164, 127 C. C. A. 22; Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017, and cases last above cited.

Upon the question of anticipation (4), the defendant places its reliance upon the Sargent patent, No. 295,056. There is no suggestion anywhere in the Sargent claim or specification of a left-hand set, nor of any oblique bend or side twist. That patent, now expired, it is true, does cover the Kinsley trap, with the exception of the spring; but the spring is the only thing claimed to be new in the patent in suit, and upon this the suit is predicated.

[2] Defendant suggests that, if the spring of the Sargent patent were bent or twisted obliquely as well as upward, it would be exactly like the patent in suit, yet it never occurred to any one prior to Kinsley that such oblique bend would give the trap a left-hand set and would be better than anything in traps that had ever been on the market theretofore. It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted nor actually used for the performance of such functions. Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658.

The following quotation from Potts & Co. v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275, is germane:

"And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of before. The apparent simplicity of a new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before. The practiced eye of an ordinary mechanic may be safely trusted to see what ought to be apparent to every one."

Moreover, the so-called slightly upbent spring in the model of the Sargent patent, produced by the defendant in court, failed to operate when swung towards the free jaw (given a left-hand set). An inoperative device is not anticipation. There is some dispute as to whether the photographs of the Sargent patent were accurate; but the model of the patent, and also its claims and specifications, fail to disclose anything which anticipates the Kinsley patent.

The Seymour patents, Nos. 407,129 and 344,994, are not anticipative of the patent in suit. The Seymour traps are "no-cross" traps, and both jaws are locked. No obliquely upbent spring could be used in such traps. The Cook patent, No. 312,094, does not disclose a left-hand set. This patent relates to the trigger or detent device and bait pan. The Kelley patent, No. 404,468, shows no anticipation. The magazine publications offered in evidence merely refer to the Sargent trap, and hence are not anticipative.

[3] The claim in suit is valid, and has been infringed by the defendant's Giant Victor trap springs.

The plaintiff is entitled to a decree.