Booth, Judge,
delivered the opinion of the court:
Albert H. Johnson, on November 12, 1912, filed in the Patent Office an application for a “ patent for transmitting apparatus for wireless telegraphy.” Letters Patent No. 1145066 were duly issued upon the application to the plaintiff company, assignees of Johnson, July 6,1915. On September 23, 1915, Johnson filed another application for a design patent embodying a casing for the generator of wireless telegraphy, on which application the plaintiff, as assignee of Johnson, secured Letters Patent No. 48638 on February 28, 1916. The petition asserts the liability of the Government as an infringer under claims 1, 4, 6, 7, and 8 of patent No. 1145066, both patents being involved. The origin of the claim is traceable to a desire of the Navy Department in the latter part of 1909 and the first of the year 1910 to obtain wireless telegraph sets which would meet Navy requirements. To accomplish the purpose, plaintiff was requested to attempt the construction of a wireless set “ embodying a five-hundred-cycle alternating-current generator.” The plaintiff did design and construct such a machine; i. e., Mr. Johnson, plaintiff’s superintendent, did the work. The machine so designed was necessarily experimental in character, and subsequent to tests, the Navy Department, on April 1, 1910, issued a requisition for five sets of the Johnson type, which were duly furnished and paid for at the price of $400 each. The purchase was made without advertisement, and the requisition for the article purchased contained these significant words: “ This is experimental material and can be supplied by this company and no others.” The findings disclose that the sale was made without profit to the vendor. The five sets were installed on board the TJ. S. S. Montana on or about April 9, 1910, for the purpose of test and use. Numerous defects in material were discovered, and numerous changes were ma de upon the suggestions of both parties. The sets did not respond favorably in the *633 Tropics; overheating and lack of ventilation retarded their efficiency. Finally, after frequent return of the sets to the plaintiff for changes and modification, they were found to be satisfactory and sufficiently powerful to transmit wireless messages within a radius of twenty miles. Three years of time was consumed in perfecting the apparatus to this favorr able point. A diagrammatical illustration of one of the sets appears in the appendix to the findings.
The patentee’s conception in this respect was embodied in a machine composed of a bedplate or frame upon which rested an alternating-current generator and a direct-current motor. The armatures of the motor and generator were mounted upon a common shaft, extended beyond the bearing at the motor end, upon which there was mounted a combined flywheel and fan. The flywheel functioned to store up energy during periods of nondelivery of current to the transformers of the wireless set and obviously served to assist the motor during periods of current demand. The original source of electric current was the ship’s generators, a rheostat being employed to start or stop the machine. The sending key “ K ” was connected in series with the field winding of the alternating generator and the source of current “A.”
Without going more into specific detail, it is sufficient for the present to observe that two elements effective in the operation of the above machine appear in the source of power utilized to rotate the shaft upon which the motor and alternating current were mounted and in the placing of the operative key. Both play an important part in the disposition of the case. A machine, to meet the requirements of the Navy, had to possess features of distinctness in the form of compactness whereby they might be sheltered from destruction in the event of naval engagements by proper placement on board the ship, and certainty of operation in whatever climate the vessel might enter. Intercommunication with the ships in the fleet was the objective of the naval officers; to attain the purpose required a machine available both in peace and war times. Johnson, the original patentee of the latter machine, met the objective, and the first machine was a success. Success in the first attempt immediately suggested to the inventor the utilization of an apparatus for a *634 similar purpose, available in the field or wherever to be used, capable of operation without reliance upon electric current from an independent source of power, differing from the first machines which were operated by “ plugging in ” on the ship’s electric generators. Johnson’s idea was to attach to the machine a suitable apparatus, a manually operated source of power, thereby enabling the machine to function either on board a ship or in the field. In the language of the inventor, “ the invention is concerned only with the utilizing of such small energy to produce the maximum signaling range.” To attain the desired end involved more than mechanical skill.- It is true the elements the inventor had at hand and employed were old in the art; electric currents, electric generators, transformers, and intermittent key operations were well known as essential factors in transmitting electric energy. The opportunity for inventive genius in this respect was restricted within narrow limits. What could or could not be accomplished by electric mechanisms and the natural consequences flowing from the use of electric energy in the art of wireless telegraphy, so far as this record is concerned, offered little in the way of basic patents. Johnson’s first machine demonstrated the obvious fact that where the source of energy is continuous and powerful the magnetic drag occasioned by the constant energizing of the magnetic field of the alternating-current generator was a matter of small consequence. Likewise the location of the key for intermittent transmission caused no particular concern. What the inventor had to overcome if a manually operated machine was to prove successful was to minimize or remove the effect of the magnetic drag, a retarding force which effectually precluded the possibility of successful operation by man power.
It is conclusively established that the magnetic drag present in Johnson’s first machine was sufficient in extent to retard almost to the point of inefficiency the supplying of sufficient force to rotate the armature shaft upon, which the generators were mounted by the hand of man. What, then, did the patentee do ? This is best illustrated by the diagrammatic illustration in Finding V. In most respects the same construction employed in the first machine was again made *635 available in the second machine. The vital distinction over the prior art, however, resides in the important fact that by an original conception Johnson did overcome the effect of the magnetic drag and made possible the supplying of energy by manual force; i. e., he utilized a “ small energy ” and did “ produce the maximum signaling range.” How was it done ? First, of course, was the attachment to the armature shaft of the flywheel “ 23,” operated by means of the cranks “ 17 ” and “ 18,” suitably supported by the shaft “ 19,” which carried the sprocket wheel “ 20,” power being supplied to a small sprocket “21 ”.on shaft “ 9 ” by means of a sprocket chain. The key “ 10,” which in the prior art was located in the output circuit, was in the new machine included in circuit with the armature winding “ 1 ” and the field “ 6,” with the result that when the armature shaft was rotated by the rotating device, manually operated, current is generated in the armature windings and the field “ 5 ” of the direct-current generator “ 2 ” energized; but the field “ 6 ” of the alternating-current generator “ 8 ” is not energized except during the times when the key “ 10 ” is closed, and, as admittedly true, the key “ 10 ” is closed approximate^ 45 per cent of the time, 55 per cent of the time is utilized by the manually operated device in storing up energy available as power when the key is closed and the magnetic drag tends to retard even and continuous flow of current.
The manifest difficulties of accurate description render an indispensable and constant reference to the illustrations lest the. real invention become obscured. Therefore it is especially essential to note that the patentee’s machine was1 the first in the field enabling the use of a small energy source to operate a portable wireless transmitting apparatus capable of producing .the maximum signaling range, and that this was accomplished by the utilization of elements old in the art, but employed in a new and novel way. It is not disputed that prior to the advent of the machine in suit operators at the hand device, with the alternating-current generator field “ 6 ” continuously energized, could not with a maximum of effort produce to exceed 200 watts of electric current. With the present machine a minimum of effort produces easily 300 watts, and, what is of vast importance, a continuous even *636 flow essential to the effective transmission of dots and dashes. By the use of this machine the signaling range was increased .to 80 miles and it was found to be impervious to a change of climate. The experts of the Interdepartmental Radio Board tested the structure of the patent, carefully investigated its efficiency, and from current measurements reported that the patentee, by the single act of placing the key “ 10 ” in the field circuit instead of the output circuit “ K,” saved at least 20 per cent of the input energy, and that this saving accomplished “ greater distance of operation or longer operation of a lesser distance without changing operators.” Most significant in this connection is the testimony in the record that Johnson, in .the designing of his machine, applied the various elements at his command in a way contrary to the usual scientific formula, or the way and manner usually employed by those learned and skilled in the art. Again, the machine proved useful. It supplied a need, was recognized by the trade as conspicuous and valuable, and found a large and profitable market, as reflected in the number of sales made and demand therefor. The patentee’s claims, nine in number, cover the novelty of the invention and clearly disclose that the inventor did conceive the original idea of making available for radio transmission a compact, portable machine, capable of use wherever, a minimum of man power was available to turn the cranks “ 17 ” and “ 18 ” and rotate the armature shaft.
In the prior art two patents, one to Shoemaker, No. 756120, and another to De Forest, No. 749485, are cited as anticipatory of the patent in shit. In addition to the above patents excerpts from certain textbooks disclosing prior practice in electric-generator construction are insisted upon as conclusive. The Shoemaker patent was cited by the patent examiner during the prosecution by J ohnson of his application for patent and Johnson’s original claims were rejected thereon. Subsequently J ohnson presented to the examiner a statement pointing out in detail the distinct variance between the Shoemaker invention and his own, and the Patent Office reconsidered Johnson’s application, suggested certain amendments of claims, in the following language:
*637 “ Upon reconsideration claims 12 and 18 are allowed and claims 9 and 11 may be allowed if applicant will add at the end of these claims — whereby the armature shaft may be operated at a substantially uniform speed from a small-energy source. The Shoemaker patent clearly discloses all that applicant is claiming except the idea of storing wp enough energy during the periods that the hey is open to permit the use of a source of power so> small that it Would oihemoise he vmamaüdble. The claims which bring out this idea in connection with the specific apparatus us'ed are considered patentable.” (Italics are ours.)
Shoemaker’s conception was concerned with a radio-transmitting apparatus and not with the generator. There is nothing in the claims to anticipate the predominant idea of Johnson in utilizing a small energy source to operate the apparatus to attain the maximum signaling range. Shoemaker employed a relatively large current from an outside source to magnetize the field circuit and nowhere seems to have conceived the possibility of utilizing a minimum energy from a source attached to the machine itself. The placing of the key as shown was for the obvious purpose and function of satisfactorily controlling the high potential output produced by the plurality of generators in series and, as previously observed, the employment of great force to function the armature and set the machine ,in motion would, when used as used in the Shoemaker patent, render the magnetic drag quite unimportant. As a matter of fact, Shoemaker made no claim as to the location of the key, and clearly Shoemaker placed no reliance upon the key to function as Johnson designed it to function in making available a small source of energy. Observing the two patents in diagrammatical .illustrations, a first impression might well suggest a marked similarity; but when read in the light of their respective specifications and claims it is manifest that the two inventors were wide apart in their conceptions of a des,ired accomplishment. The plaintiff cites a case, Gray Telephone, etc., Co. v. Baird Mfg. Co., 174 Fed. 417, an excerpt from which is apropos:
“A patent for a mechanical combination is not anticipated by a drawing in a prior patent which incidentally shows a similar arrangement of parts, where such arrangement is *638 not essential to the first invention, and was not designed,adapted, or used to perforin the function which it performs in the second invention, and where the first patent contains no suggestion of the way in which the result sought is accomplished by the second inventor.”
Of course, as many times said, and not infrequently refied upon, it is now easy to see how Shoemaker’s invention might with slight modification function as Johnson’s patent did function. The test, as uniformly sustained by the courts, is whether the prior patent was actually designed by the inventor to accomplish the identical purpose disclosed in the patent upon which it is cited as anticipatory. Triumph Trap Co. v. Oneida Community Go., 279 Fed. 142; Toplif v. Toplif, 145 U. S. 156; Potts v. Greater, 155 U. S. 597.
Extensive comment upon the De Forest patent is, we think, unnecessary. De Forest does show a portable radio set; but it functions in a way that clearly demonstrates no conception of the employment of a small source of energy to obtain the largest scope of signaling.
The court has commented upon the fact that Johnson employed elements old in the art. Johnson has not disclaimed the fact. Textbooks are numerous pointing out the scientific operation of electric current and the precise manner in which it may be utilized to serve a designed purpose. New machines and novel devices are almost daily coming into existence taking extensive advantage of the knowledge published broadcast and easily obtainable. Of course direct-current exciters, alternating-current generators, flywheels, fans, sprockets, etc., mounted upon an armature shaft were old; but old as they were, they were not combined into a successfully operative device which could be made to function and obtain the highest possible result by the application of a minimum amount of energy supplied by the hand of man. The problem Johnson was dealing with was to discard the well-known and long-established fact that with an independent and powerful source of energy it was not difficult to construct a portable generating dev,ice. Manifestly such a source of power is not under all circumstances available, and when not available the machine is useless. Johnson brought into being a machine that successfully functions *639 irrespective of this source of power, a machine capable of instant use wherever a limited number of men may be found to turn the cranks. This we think was new and novel. It d,id succeed. It is now in use, and admittedly is the only machine of its character capable of being used as it was designed for use, both in the field and on board ship.
Where the field is open for a long period of time, after the first attempts to supply a needed invention, such as the one in suit, have met with no substantial success, it is according to familiar patent authorities some evidence of invention and, to say the least, persuasive testimony that the final accomplishment of the desired purpose involves more than mere mechanical skill. Especially is this so when other experts in the art are striving during this interval to do the thing that is finally done. Judge Learned Hand, in delivering the opinion of the court in the recent case of Westing - house Electric & Mfg. Co. v. Independent Wireless Telegraph Co., 300 Fed. 748, 753, used these words:
“ It is not important whether anyone before Armstrong had fed back oscillatory currents from a telephone circuit to a circuit tuned to the oscillations received by an antenna, and had so reinforced them. That might be admitted. No one had ever used that discovery to amplify the grid currents of De Forest’s audion, and Armstrong’s patent is confined to that. It took seven years to make the step, years in which the best electrical minds were at work upon wireless telephone. It is idle, at least, when the question arises in this way, to argue that such an adaptation was within the compass of the ordinary routine wireless electrician. Unless the delay can be explained, it is of itself good enough proof to lay any doubts as to the quality of the invention. I might therefore leave these references without further comment, merely on the chronology of the art.”
Section 4920, R. S., Title XL, provides as follows:
“ In any action for infringement the defendant iñay plead the general issue and, having given notice in writing to the plaintiff or his attorney thirty days before, may prove on trial any one or more of the following special matters: * * * Fifth, that it had been in public use or on sale in this country for more than two years before his application for patent, or had been abandoned to the public.”
*640 The plaintiff, as the findings show, did sell to the Navy-Department five of the first type of machines for $400 each and received payment in full therefor. This sale antedated the patent in suit by more than two years. The record is emphatic that no profit accrued to the plaintiff from the sale. The defendant very properly raises the issue that the transaction described absolutely precludes a recovery under section 4920, inasmuch as the sets so sold differ only from the patent alleged to have been infringed “ in the production of the direct current to excite the field of the alternating-current generator.” Claim 2 of the patent in issue we think is anticipated by reference to the sets so sold. This claim, however, is not involved in this litigation. While we feel certain of a distinct departure from the sets sold in the respect insisted upon by the plaintiff in the patent at issue, yet, notwithstanding this fact, we are of the opinion that under the adjudicated cases section 4920 has no application in any event. The courts have repeatedly held that experimental use is not public use, and where an inventor makes a single sale for the sole purpose of experimentation he does not come within the meaning and intent of the statute. The line of demarkation is quite distinct, the difficulty lying in the ascertainment of the fact. The statute uses the significant words “in public use or on sale in this country for more than two years before his application.” Judicial precedent establishes beyond disputation that the designed purpose of the law was to preclude an inventor from the advantages of a patent monopoly where for the stated period of time he had abandoned the right to the public to use the invention or sought to profit from his enterprise in the usual and customary commercial way. Obviously the public was to be protected from the consequences of the patent law where an inventor for so long a time, indicated no intention of applying for a patent, or apparently had no idea that his invention was patentable, in other words, abandonment of the patent. If, however, a single transfer of the invention takes place under circumstances which clearly demonstrate that the transaction was consummated solely with a view of perfecting a device, one necessarily experimental, and the device is subsequently modified, changed, and perfected, in *641 accord with the use for which it was transferred, then the so-called sale is not one coming within the law, but is experimental in character. Walker on Patents, 1923 edition, sections 93 and 94, pages 111, 112, 113, and 114, traces the origin of statutory law on the subject of abandonment in section 94, the author summarizing the law as follows:
“ What is ‘ public use,’ within the meaning of the statute ? This question has now received light from a sufficient number of decisions, affirming or negativing the fact of public use in particular cases, to make it possible to deduce a nearly complete answer from judicial authorities.
“ If the inventor allows hi/s invention to be used by other persons generally, either with or without compensation, then it will be in public use within the meaning of the statute. And the use is public, which follows a transfer of the thing used from its inventor to the user, without reserving any control over it and without expecting to make any change in it, or without any restriction.
“ If the inventor uses his invention for profit and not by way of experiment, that is a public use, unless actual use resulting in profit is necessary to show the inventor how to perfect his invention and unless he does perfect it in accordance with the teachings of such use; but experimental use becomes public use when it extends further, either in time or in number of instances, than i,s reasonably required to test the invention. Nor will the fact that the inventor is but an employee in the place where he uses his invention, or the fact that the profit goes primarily to his employer, oust the operation of this rule.
“ To constitute public use it is n,ot necessary that more than one specimen of the thing invented should have been publicly used, nor that more than one person .should have known of that use. Nor is it necessary to public use that the article used could have been seen by the public eye, if the ordinary use of such articles is veiled from view.”
Testing the single sale made by the plaintiff by the essential elements /stated in the above quotation, it is seemingly clear that the plaintiff’s case is not within the prohibition. First, the plaintiff did not realize a profit from the‘sale; second, the transfer was necessary to show the inventor how to perfect his invention; third, the inventor did not have available to himself the means to make the required test; fourth, the inventor did modify and perfect the machine in *642 accord with suggestions arising from the te(st; fifth, no other sales were made of the machine and no attempt made to. place it upon the general market; sixth, it required a three years’ test before the machine met the complete expectations: of the inventor and the Navy.
The plaintiff cites copious excerpts from a multitude of cases, too many and too familiar to warrant citation, sustaining the principles to which we have just alluded. We think we may rest the issue upon what was said and has been repeatedly affirmed by the Supreme Court in the leading-case of Root v. Third Avenue R. R. Co., 146 U. S. 210.

Resign Patent No. 4-8638

The defendant challenges the validity of this patent. The patent was granted in virtue of section 4929 R. S., Title LX. Under the statute “ any new original and ornamental design for an article of manufacture,” etc., is patentable. The case of Dietz Co. v. Burr & Starkweather Co., 243 Fed. 592-594,. cited in defendant’s brief, construes the above statute, and in our view of the issue determines the question. Judge Hough,, in disposing of a similar contention, said the following:
“ To entitle an inventor to the benefit of a design patent, there must be originality, the inventive faculty must be exercised, mere mechanical skill is not enough. Cary Co. v. Neal, 98 Fed. 617. Steffens v. Steiner, 232 Fed. 862. The test for invention is the same for design as for mechanical patents. Strause v. Grane Co., 235 Fed. 131. All design patents appeal to the eye; they must present something pleasing and attractive (Mygatt v. Schauffer Co., 191 Fed. 836) and relate to appearance and to matters of ornament. The-utility of the patent depends on the effect upon the eye, not, to any new function; and such appeal is to the aesthetic emotion. Rowe v. Blodgett Co., 112 Fed. 61. The object of the statute is to encourage the origination of objects ‘ which give pleasure to the sense of sight.’ Mygatt v. Schafer, 218 Fed.. 831. ,* * * Applying these rules to the matter in hand,, we are of opinion that McArthur’s lantern, or any lantern looking like that of the design, does not appeal to the aesthetic sense, and represents nothing more than a convenient shape for an article always purchased and used for what, it will do — not for its looks.”
*643 The court had before it a physical exhibit of the design relied upon. Sitting as a jury in this respect, it would be difficult to return a finding that the casing presented any usual ornamental features “ appealing to the aesthetic emotion.” While we do not overlook the force and effect of the passing to patent of such a design by the Patent Office, we do believe from the evidence in the case that there is nothing of ornamentation or unusual characteristics of construction in the make-up of the casing which in any manner would arrest the attention of a prospective user as an article of beauty. As the defendant aptly suggests, “ the purchase by the United States of a generator was undoubtedly because of ‘ what it will do — not for its looks.’ ”
The defendant does not seriously contest the infringement of the claims involved, and we think that there is ample proof to sustain the judgment of the court that the plaintiff is entitled to recover.
The case is to be remanded for proof as to damages. The record is incomplete in this respect. Therefore it is ordered that the case be remanded and referred to Mr. Hayner Gordon, Special Commissioner of the Court, to take testimony upon this point and report the same to the court.
Moss, Judge; Geai-iam, Judge; and Campbell, Chief Justice, concur.