## WESTINGHOUSE ELECTRIC & MFG. CO. et al. v. INDEPENDENT WIRELESS TELEGRAPH CO. et al.

(District Court, S. D. New York. June 3, 1924.)

1. **Patents ⊚⇒297(3)—Decision of local appellate court binding on inferior courts.**

   That the decision of a Circuit Court of Appeals as to the validity of a patent is in conflict with the later decision of another court of co-ordinate jurisdiction does not change its binding effect on District Courts within the circuit so long as it stands.

2. **Master and servant ⊚⇒305—Master responsible for patent infringement by servant.**

   Patent infringement by a servant acting within the scope of his general authority is none the less the tort of the master, because the master has expressly forbidden him to commit it.

3. **Patents ⊚⇒210—Sale of one element of patented combination held not to imply license to use the combination.**

   The sale of one element of a patented combination, which has other uses, carries no implied license to the buyer to furnish the other elements himself and complete and use the combination.

4. **Patents ⊚⇒297(2)—An adjudication of validity adds to the presumptions in favor of the patent.**

   An adjudication of the validity of a patent must be considered as adding something to the presumption in its favor arising from the grant, especially on a motion for preliminary injunction, where new matters cannot be tried in extenso.

5. **Patents ⊚⇒328—No. 1,113,149, for an audion wireless receiving system, held valid and infringed.**

   The Armstrong patent, No. 1,113,149, for an audion wireless receiving system, *held* not anticipated and valid, on motion for preliminary injunction, and also infringed.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company and others against the Independent Wireless Telegraph Company and others. On motion for preliminary injunction. Granted as to the Telegraph Company.

On order to show cause why an injunction pendente lite should not issue to restrain the defendants from infringing patent No. 1,-113,149, to Edwin H. Armstrong. This patent has been sustained in another suit by the District Court (279 Fed. 445), and by the Circuit Court of Appeals (280 Fed. 584).

Stephen H. Philbin, Charles Neave, and L. F. H. Betts, all of New York City, for plaintiffs.

Ramsay Hoguet, of New York City, for defendants.

LEARNED HAND, District Judge. [1] Since this motion was argued, the Court of Appeals for the District of Columbia has awarded De Forest priority over Armstrong upon certain claims in interference proceedings. This does not affect the disposition of the motion. If, as the Court of Appeals said, the invention awarded De Forest is so different from that at bar that both may stand, obviously I may ignore that decision. If, on the other hand, the inventions are so closely akin that their dates of discovery must be identical, as would seem to be the case, still the award of priority to Armstrong in the Circuit

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Court of Appeals of this circuit on the same facts must prevail in a suit in this district until that court sees fit to change its conclusions. It may be conceivable that the courts here will defer to the Court of Appeals of the District of Columbia, so far as concerns the award of those claims, and still adhere to their conclusion upon the patent in suit. However that may be, the issue decided here on this patent must be taken as conclusive in preliminary applications while the decision stands. I know of no rule which compels me to ignore the conclusion of the local court of last resort, because it has come into collision with that of a court of co-ordinate jurisdiction. While it is true that this discordance may in the end present a question which must be settled by the Supreme Court, until that happens I do not understand that it affects the finality for me of the decision of that court to which an appeal from me directly lies.

The defendants present four defenses: First, that the defendants were not parties to the putative infringements; second, that they had an implied license to use the invention; third, that the acts charged were not infringements at all; fourth, that the new evidence now at bar throws doubt upon the validity of the patent.

[2] First. There is no dispute that the post $T^2$ of the plaintiff's detector-amplifier was, in a substantial number of cases connected with the antenna post, so as to establish a wing circuit having a leg in common with the grid circuit. This, moreover, resulted in the "regeneration" of the radio-frequency oscillations in the grid circuit, and, subject to the matters discussed in the third objection, constituted infringement. The defendant Independent Wireless Telegraph Company alleges that it had forbidden any tampering with the wires by its operators, and it must be agreed that the question is at best in dispute whether that company had at any time, directly or indirectly, authorized any such connection as the operators occasionally made. In view of that uncertainty, if it amounts to so much, the objection must be disposed of as one of law. Are the defendants responsible for the acts of these operators? They were servants of the defendant Independent Wireless Telegraph Company, employed by it to operate the wireless installations on the ships of the defendants, the steamship companies, and what they did was unquestionably within the scope of their authority. It makes no difference, therefore, whether they were forbidden to tamper with the wires or not. In some instances they may have done so idly, not in the course of their duties; in such cases I need not say that their acts were within the scope of their authority. But surely it cannot be seriously argued that the tort of a servant in the scope of his general authority is any the less the tort of his master because the master has expressly forbidden him to commit it. I cannot think it necessary to cite any decisions for so common a doctrine of law.

Hence in those cases in which the operators for the purposes of the defendants used the installation regeneratively the operator's tort is to be imputed to the defendant Independent Wireless Telegraph Company, and a succession of such torts will support an injunction against their continuance. I do not, however, find anything in the affidavits to

show that the steamship companies were privy to the practice, individually, or by their servants, and no injunction will go against them.

[3] Second. I can find no basis for any implied license in the sale of the detector-amplifiers alone. It is not clear how the Radio Corporation could have prevented the regenerative use of these units without changing their structure. It is clear that to short-circuit the posts $T^1$, $T^2$, would have accomplished nothing, because the operators had to do this themselves before they could lead the wire from the post, $T^2$, to the antenna post. Otherwise there would have been no complete wing circuit for either frequency. The argument comes down to this: That in selling one element of a patented combination the seller gives a license to the buyer to furnish the other elements himself and so complete the combination. Such a doctrine is I venture to believe, quite unheard of in the law, and would, if consistently applied, lead to the most extravagant results. No one would, of course, suggest that the sale of a pawl and ratchet gave an implied license to use all patented combinations in which those mechanical elements were to be found. I agree that the instance is extreme, but it tests the principle.

If the article has other uses than in the patented combination, there is no basis to imply a license. Gen. Elect. Co. v. Continental Lamp Works (C. C. A.) 280 Fed. 846; Edison, etc., Co. v. Peninsular, etc., Co., 101 Fed. 831, 43 C. C. A. 479. It is only when the article sold must be used in the patented combination, if it be used at all, that a license is implied. The plaintiffs' detector-amplifier was capable of use without a "tickler" coil or its equivalent, the "antenna-plate" connection. The Independent Wireless Telegraph Company never intended it to be used as a regenerator; it was content to set up the apparatus without any regenerative connection, and its orders were to leave the connections as they were. Thus it expected to get no license, and there is no ground to imply that which neither party intended. I agree that, if the plaintiffs had held a patent merely for the combination of grid and wing circuits, the defendants would have had a license, because the detector-amplifier could not have been used without a grid circuit. They were not entitled to all possible uses of the unit which they bought.

Nor is there more weight in the argument that the insistence by the Radio Corporation upon sending out continuous wave signals was a consent to the infringement. It is scarcely an excuse for conversion that the owner flaunts his possessions. Even if it were proved, which it is not, that the Radio Corporation's insistence were only to try out the forbearance of the operators, it would not be a license. At most it was no more than to say that, if the ship wished the news from that source, it must have the patented combination. However, the case need not stand on those instances, because it is amply proved that the operators occasionally made the connection spontaneously, without any spur from the plaintiffs. In those cases, anyway, that act was a tort, if it infringed the claims.

Third. Of infringement: All the claims require "a resonant grid circuit," which means one that can be tuned. A circuit can be tuned only in case its responsiveness can be varied by an inductance as well

as a capacity, so that it can adapt itself to different wave lengths. The metallic grid circuit of the infringing device is apparently not resonant at all, because, while it contains two condensers (capacities), and the grid leak with its proper condenser, it has neither inductance proper nor telephones which might act as an equivalent. The defendants' brief claims that the grid circuit is not in fact resonant, that feature having been found unnecessary. The plaintiffs' brief, on the other hand, says that the antenna inductance is within the grid circuit, the induced current in which splits at the switch post, next the coupling condenser. One part follows the metallic circuit containing the antenna condenser, while the other ascends the antenna through the inductance, is taken up at the ground plate, and reaches the metallic grid circuit again at the ground post.

The affidavits of the experts, Hogan and Loftin, must decide the issue so raised. Hogan says on page 15:

"It will be noted that the intercoupling of the plate and grid circuits is through the inductance which is in the antenna-ground circuit and also in the plate and grid radio-frequency circuits."

This can only mean that the antenna inductance is in the grid circuit in some such way as is set forth in the plaintiffs' brief. Loftin, on the other hand, says on page 22 that "a resonant grid circuit is not found in the arrangement. * * * It would be impossible to tune the grid with the elements"—i. e., the two condensers—"without some inductance in series with them, not found in the exhibit." Since I must take all issues of fact in the defendants' favor, I agree that on this motion I have no right to hold that the defendants' grid circuit is resonant in the sense in which the specifications use that term, although I confess that it seems to me curious if that be not in fact the case.

Nevertheless, I think that the combination infringes under the doctrine of equivalents. A "resonant" circuit is indeed one which can be "tuned," but, unless the grid circuit can take up the radio-frequency oscillations from the antenna-ground circuit, the apparatus will not work. "Tuning" makes the responses stronger, but an "untuned" circuit, if properly constructed, will give some response to some waves and probably to all. If the defendants have found that an "untuned" grid circuit will adequately take up and transmit the received oscillations, it is functionally a resonant circuit, though it may be a poor one. The analogy applies of a chord or sounding box which is set in vibration sympathetically by the imparted vibration of another chord. Changes in the adjustment of the secondary vibrant affect the strength of its response, but it will respond somewhat, though untuned sympathetically. Resonance is necessarily a matter of degree, and "tunability" permits it to reach an optimum. If the art was wrong in supposing that that optimum involves "tunability," then the grid circuit is as completely resonant in function as though it were adjustable. In any case the grid circuit answers the purposes of the circuit intended by the specifications.

The patent, if not a pioneer, made a long advance in the art; it is entitled to a generous scope. Though Armstrong assumed that all grid circuits must be tuned, if it now turns out that the same result

may be reached with an untuned circuit, the regeneration produces the same result and in substantially the same way. It is no answer for one who regenerates the oscillations in the grid circuit from those in the wing by giving a common leg to the two to say that his grid circuit is not adjustible. At most, such an infringer is using the invention in an imperfect form, and that is never an excuse for its appropriation.

Claim 8 would not, it is true, be infringed on this hypothesis, because there would be no inductance in the leg common to the two circuits. Claim 15, which has no such limitation will serve equally well. The supplementary means to transfer the energy of the wing upon the grid circuit is the common leg, which exists whether or not the inductance is in the grid circuit. Any claim will serve for an injunction pendente lite, and the objection is not good.

[4] Fourth. As to the new references: Such references have a quite different importance after an adjudication. Had these been the only references presented to invalidate the patent upon motion for injunction pendente lite before adjudication, I will not say that they might not be fatal to the application. However, once a patent has passed through the fire, it gains an immunity which it did not originally have. Though the contest is between new parties the late comer must accept some degree of vicarious estoppel from the failure of his predecessor. There is, indeed, no logic in this, and in the end nobody is concluded by the results of other lawsuits. Yet when the question is only of the status quo, and the opportunity does not offer to go into the new matters in extenso, the law recognizes that some compromise is necessary, and, as it resolves the doubts against the patentee till he has added the decree of a court to the presumptions arising from the grant of his patent, so it resolves some doubts in his favor afterwards. While, therefore, I should not refuse to consider these references, it is fair that I should require of them that they should throw a much larger measure of doubt upon the invention than if no suit had been tried and the art had not been already searched for relevant anticipations.

[5] Some of the new matter I may discard at once. Wallace's supposed prior use was considered by the Circuit Court of Appeals on De Forest's application for a rehearing, and was rejected. Further, it is not the kind of reference, depending as it does upon oral evidence, which will defeat an application like this after decree and affirmance. It must await the trial. Lindridge was also before the Circuit Court of Appeals, and I must assume that it was considered. It was after the date, August 6, 1912, which De Forest claimed, and he could not have been embarrassed to assert it against Armstrong. In any case he did so assert it. It too must await the trial.

There remain only three references: The "humming" telephone, represented by the Gill article, with the comments upon it, and Miller's British patent of 1904; the De Forest original audion patent of 1906; and Vreeland's two patents of 1906. It is very difficult to reach a satisfactory conclusion upon affidavits as to the meaning of these references, and it is really not necessary to do so, for the following reason: The last of them appeared as a public possession of the art in

1906. Up to the time of Armstrong's date, January 31, 1913, nobody had conceived, or, if he had conceived, had reduced to practice, any plan of regenerating the grid current of an audion by those induced in the wing circuit. It was first necessary to understand that there were any radio-frequency, or even oscillatory, currents in the wing circuit at all. Next, it was necessary to find a way in which it would be possible to use them to reinforce the grid current. It is not important whether any one before Armstrong had fed back oscillatory currents from a telephone circuit to a circuit tuned to the oscillations received by an antenna, and had so reinforced them. That might be admitted. No one had ever used that discovery to amplify the grid currents of De Forest's audion, and Armstrong's patent is confined to that. It took seven years to make the step, years in which the best electrical minds were at work upon the wireless telephone. It is idle, at least, when the question arises in this way, to argue that such an adaptation was within the compass of the ordinary routine wireless electrician. Unless the delay can be explained, it is of itself good enough proof to lay any doubts as to the quality of the invention. I might therefore leave these references without further comment, merely on the chronology of the art.

However, it seems pretty clear that, if any regeneration of radio-frequency currents takes place in Moller's telephone circuit, Moller never knew it. For all he showed, the amplification of the current in the telephone circuit was due solely to induction from the currents in the microphone circuit, having no provenience from the telephone circuit itself. Besides, the received oscillations from the antenna were supposed to do no more than close the telephone circuit by changing the conductivity of the coherer.

De Forest's original audion patent, as well as his later form, in which the "grid" electrode was inserted between the hot filament and the plate of the wing circuit, showed what they did show. De Forest has never claimed a date for the invention in suit prior to 1912. True, he might have refrained, because his claims were not broad enough; but the conclusions of the courts in the original suit on this patent expressly found that he had no comprehension of the operation of the invention in suit until after Armstrong, in January, 1913. To say that his patent seven years earlier is an adequate disclosure is in effect to say that his claims are fabricated; that he had understood all about the invention in 1906, and had then omitted to claim it, for some wholly unimaginable reason.

Finally, Vreeland's patents may be disregarded, without any technical consideration of them whatever. Loftin's present opinion that they anticipate Armstrong is for the purposes of this application effectively answered by his earlier opinion of their effect while he was the chairman of the Interdepartmental Radio Board, which reported upon Armstrong's patent. After an extensive examination, the technical details of which I have no need to follow, he and his associates concluded as follows:

"It therefore appears that there were two steps between the prior art and the modern apparatus: First, the grid or electrostatic control member, intimately associated with the sensitive gap by actual insertion inside of the

tube, and further by actual direct introduction in the path; second, the interlinkage of the two circuits. It is true that Vreeland actually named the first step, but without the slightest hint as to how it could be brought into practice and without any art prior to him to sustain the vague reference. The second step does not appear to Vreeland or the art prior to him."

Thus the plaintiffs' right to have an injunction against the practice of making the antenna to plate connection is established with enough certainty to justify an injunction. It cannot be a serious matter to the .Independent Wireless Telegraph Company that I take them at their word, and assist them by an injunction to control their operators, whose insubordination has already occasioned them. so much annoyance. They need not fear that if they show a co-operative spirit in preventing repetitions of the tort, they will suffer in contempt beyond the losses caused by the acts of their servants. If these men are themselves enjoined, perhaps that will, in addition to their employer's displeasure, effectively bend them to obedience. At least I am gratified to be able to put at the disposal of that employer the assistance of the court's writ. We can only try it and observe the effect.

Injunction pendente lite to go against Independent Wireless Telegraph Company. Motion denied as to steamship companies.