**BOURJOIS, Inc., v. PARK DRUG CO., Inc.**

**No. 10367.**

Circuit Court of Appeals, Eighth Circuit.

March 13, 1936.

Asher Blum, of New York City (Lewis, Rice, Tucker, Allen & Chubb, of St. Louis, Mo., and Mock & Blum, of New York City, on the brief), for appellant.

Ralph Kalish, of St. Louis, Mo., for appellee.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

Bourjois, Inc., is a New York corporation engaged, among other things, in selling its face powder throughout the United States under its registered trade-mark "Evening in Paris." The product is skillfully compounded of pure nonpoisonous and harmless ingredients, has been nationally advertised at great cost, and deservedly enjoys an excellent reputation so that the good will of the business is of the value of much more than $3,000. On April 23, 1934, Bourjois, Inc., brought this suit in equity against the Park Drug Company, Inc., a Missouri corporation, which operates six cut-rate drug stores in St. Louis, Mo., charging the defendant with trademark infringement and unfair competition. It alleged that defendant sold the Bourjois "Evening in Paris" face powder in its stores, but also kept other competing face powder, from the sale of which it could make more profit, and that defendant endeavored to and did "switch" customers of "Evening in Paris" face powder into buying the competing face powder, "by falsely * * * representing * * * that plaintiff's 'Evening in Paris' face powder was of inferior quality * * * that it would injure the skin * * * that it contained poisonous ingredients such as mercury or lead." The prayer was that defendant be enjoined from making any untrue statements or representations relative to the quality or purity of plaintiff's preparations, from switching prospective customers who ask for plaintiff's products to other products, and for accounting and damages.

The Park Drug Company pleaded that it had not made, was not making, and would not make, any false representations or statements concerning the plain-

tiff's product. It denied that its clerks had done so, but, if any of its clerks had made any false statements with respect to the plaintiff's product, such statements were made without the knowledge of defendant and contrary to defendant's instructions to its clerks.

On the trial of the case there was no proof of trade-mark infringement or "palming off," and the case was tried on the issue of unfair competition.

It appeared that the Bourjois company required the retail dealers who handled its "Evening in Paris" face powder to resell it at the price of $1.10 per box, and it was sold at that price in prominent stores in the city of St. Louis. But the defendant, from the time it started business, in about 1930, obtained the face powder from sources other than the plaintiff and persistently sold it at a lower price. On one occasion in February, 1934, it inserted an advertisement in the St. Louis Post-Dispatch that it would sell a combination of Bourjois advertised products, which included a box of the face powder, a lip stick, and a perfume, for 69 cents. Defendant says this was done to meet the challenge of a competitor in the city who had made the same offer two weeks before, it being defendant's policy to allow no competitor to undersell it. Ordinarily the defendant never "featured" the plaintiff's "line"; "never gave them counter display or window display or newspaper advertising, outside of occasional spots." Never advertised "Evening in Paris" since the advertisement in February.

About February 1, 1934, the Bourjois company, having exhausted its efforts to get defendant to sell the product at its standard price, hired a certain Mrs. Ruth Uthe, at $15 a week and expenses, in the capacity called a "shopper," to buy up all the Bourjois products offered for sale at cut prices by the defendant at any of its stores. Mrs. Uthe continued in such employment until June, 1934, and "shopped" at each of defendant's stores, and altogether she bought several hundred dollars worth of the Bourjois products. The clerks in the stores came to know her and must have known she was shopping for a purpose. Mrs. Uthe was the only person employed and paid by the plaintiff to "shop" the defendant's stores, but eleven other women who had come to the defendant's stores to buy "Evening in Paris" face powder testified as witnesses in the plaintiff's behalf. Mrs. Uthe's mother was one and her sister another; also, her sister's sister-in-law. Three others lived at the same address given by Mrs. Uthe, and it seems probable that they all visited the defendant's stores at the direct or indirect instigation of Mrs. Uthe. All of them said that the clerks of defendant endeavored to induce them to purchase a face powder called "Excella," which was sold exclusively in St. Louis by the defendant, and upon which the defendant made a large profit. They also testified that in the course of the sales talk the clerks made statements that the plaintiff's "Evening in Paris" face powder contained mercury, or that it contained white lead, or that it had a rice base (which, in truth, it has not), or that it contained other ingredients injurious to the skin of the user.

The vice president general manager of defendant and eight of its employees described in detail the selling system carried out in the stores. There are many items of merchandise upon which the margin of profit is large and the clerks are paid a commission upon the sale of such items, the commissions aggregating a substantial percentage of the clerks' total compensation. The face powder called "Excella" was one of the items upon which such commission would be paid and "Evening in Paris" face powder was not. There was, therefore, inducement for the clerks to push the sale of "Excella." But the general manager said: "Our policy was to frown upon any type of high pressure selling. It is the policy of our company that misrepresentations hurt us in the long run; that we cannot build up a business by misrepresenting merchandise;" "our policy is to sell merchandise cleanly, without misrepresentation. We do not at any time allow knocking in our stores;" the clerks "cannot misrepresent some other person's merchandise"; they forbid their clerks to knock any merchandise; "knocking means to misrepresent an article, to present it unfairly, to utter untruths about it which might be detrimental and cause hurt to the item; also means to underrate an item possibly;" "we do not at any time allow knocking in our stores." It was proven that very peremptory bulletins were published and brought directly to the attention of the clerks, absolutely forbidding them to "knock" any merchandise as a means of pushing the sale of

competing articles. The clerks maintain most positively, through direct and extended cross-examination, that the instructions given them against "knocking" were understood and obeyed and that no misrepresentation of the plaintiff's product was ever made as alleged in the bill.

The trial court concluded that the plaintiff had "failed to prove and establish the defamatory allegations and charges against defendant in plaintiff's bill of complaint contained," and among the "Findings of Fact" appear the following:

"19. That, if any of defendant's sales clerks made any misrepresentations or disparaging remarks or statements in connection with a competitive or advertised article, such instances were contrary to and in disobedience of, defendant's said instructions, and were without the knowledge or consent of defendant's managing or executive officer or officers."

"21. That defendant has not, by falsely and willfully and maliciously representing and stating to prospective customers inquiring or asking for 'Evening in Paris' face powder that plaintiff's said 'Evening in Paris' face powder was of inferior quality, or that it would injure the skin of the customer, or that said 'Evening in Paris' face powder contained poisonous ingredients, such as mercury or white lead, 'switched' such customers into buying or accepting defendant's said 'Excella' or other competing face powder."

The plaintiff's suit was dismissed and it has prosecuted this appeal. It contends at the outset that the findings of the trial court do not show whether the court believed or disbelieved the testimony of the plaintiff's witnesses to the effect that the clerks of defendant made "defamatory allegations and charges" concerning "Evening in Paris" face powder. The testimony related entirely to alleged statements of the clerks of defendant of and concerning plaintiff's product, while the court's findings and conclusions speak only of the corporation defendant. The argument is that the trial court believed that defendant's clerks had maligned the plaintiff's product, as claimed by the witnesses, but considered the corporation not accountable because the officers of the corporation had issued instructions and bulletins to the clerks against such defamation of competitors' merchandise. Appellant insists that a corporation acts only through its servants and is bound by what they do within the scope of their employment and that the principle is fully applicable in suits to enjoin unfair competition. It contends that the trial court erred to its prejudice as to the law.

■ We agree fully that the law concerning unfair competition is as stated in the contention. The Park Drug Company sells its "Excella" face powder in competition with "Evening in Paris" face powder solely through its clerks and it is bound by the conduct of the clerks in carrying on the competition. Particularly, it is answerable for any slander or defamation of the merchandise of the plaintiff uttered by the clerks to push the sales from which they derive commission. Nor is there any doubt that such slander, defamation, or false representations, when proven to have been made by the clerks of a mercantile corporation as a part of. the selling plan or system, constitute unfair competition which may be enjoined at the instance of the person whose good will is injured thereby. A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Helfi Co: v. Silvex Co. (D.C.) 274 F. 653; Id. (C. C.A.) 278 F. 613; Nims on Unfair Competition, c. F., § 4, p. 19 and Chapter XIX; International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L. Ed. 211, 2 A.L.R. 293; Vortex Mfg. Co. v. Ply-Rite Contracting Co. (D.C.) 33 F. (2d) 302; Art Metal Works v. Abraham & Straus (C.C.A.) 70 F.(2d) 641; Westinghouse Electric & Mfg. Co. v. Independent Wireless Tel. Co. (D.C.) 300 F. 748; Maytag Co. v. Meadows Co. (C.C. A.) 35 F.(2d) 403; Id. (C.C.A.) 45 F. (2d) 299. See "Statutory Unfair Competition," Mo.Law Rev., vol. 1, No. 1, January, 1936.

■ On the other hand, it appears that the findings and conclusions of the trial court were drawn up to respond to the pleadings and to the general issues. The record shows no request for the court to indicate specifically what he thought or found as to the truth or falsity of the testimony of those witnesses for the plaintiff who narrated conversations with clerks. In the absence of such a particular finding, we are not justified in assuming, from the more general findings for the defendant on the ultimate issues, that the trial court committed the error of law complained of.

Consideration of the conflicting testimony heard by the trial court convinces

that a difficult task of decision was presented. The commercial struggle between Bourjois, Inc., endeavoring to maintain its universal selling prices, and the Park Drug Company, striving to build up its chain of cut-rate stores upon the opposite principle, was intense. The trial court was struck by the resort to the use of "shoppers." Bourjois, Inc., had them and the defendant also employed them even to check up on its own clerks (among other things, to ascertain if the clerks were "knocking" merchandise). The word "snoopers" was used in connection with them. Extreme contentions were made about the effect of the defendant's practice of paying commissions to the clerks on items called "push money" items (P.M.'s) where the margin of profit was large and the practice of "switching" prospective customers to the purchase of such items. But it appeared that in the competing stores, where the Bourjois products were sold at the price required by Bourjois, such products were push money items to clerks awarded similar commissions. The testimony leaves the inquirer in grave doubt whether the defendant's clerks ever resorted to any defamation of the merchandise in order to make their desired sales. Their explanation of how they do make the sales, by puffing and exciting interest in the wares they want to sell and forgetting about and inducing the customer to forget about the competing merchandise, lends plausibility to their positive denial that they villify others.

A conspicuous weakness of the plaintiff's case on the facts lies in the failure of the plaintiff's witnesses to supply a reasonably precise identification of the clerks they charged with defamation of the Bourjois product. All of the visits to defendant's stores made by the Bourjois "shopper," and those instigated through her, were made during February, March, and the month of April of 1934, when the bill herein was filed. It would seem that at that time Mrs. Uthe, who was employed by Bourjois, Inc., by the week, could have ascertained the names of the clerks of the defendant who were being accused. Instead of such an identification by name, the descriptions run: "A medium brunette about five feet four and a half or five;" "a gentleman;" a "young lady"; "a man with dark hair, dark eyes, dark mustache, about five feet ten inches, medium build kind of, not stout, thin like;" "more of a brown haired gentleman and if I remember right he has a scar over his left eye;" and the like vague and uncertain terms.

Although it is, as stated, the duty of the court of equity to enjoin unfair competition waged by means of slander, defamation, or misrepresentation of a competitor's goods, it is a serious matter to issue such a writ against a merchant carrying on business in the community. An injunction should not be issued to prevent a threatened slander or libel as such, Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, and certainly the court will not issue the writ to prevent unfair competition unless fully persuaded by convincing evidence that the defendant has offended as charged.

The charges involved in this case are extreme: (1) That the face powder would injure the skin; (2) that it contained mercury; (3) that it contained white lead; etc. Such poisons are universally dreaded and feared. It would seem that Bourjois would point out specifically any man or woman believed to be guilty of uttering such an extreme slander against it instead of leaving the persons unnamed. Nine or ten months intervened between the alleged slanders and the presentation of the testimony concerning them. A sense of fairness to the defendant would compel caution in basing action upon testimony that seemed unconvincing to the trier of fact. As the plaintiff failed to complete any identification and it remained practically impossible for the defendant to have the accused and accusers confronted with each other at the trial nine months later, the grave doubts might well have remained in the trial court's mind after all the testimony was weighed and considered.

Appellant has contended that the Park Drug Company should have brought all its thirty-odd clerks into court for identification and also that the clerks could not be believed if they made denial, because none of them dared admit having slandered any merchandise on pain of instant discharge from employment. A point is also made that defendant falsely claimed that its "Excella" face powder had a buttermilk base. The plaintiff proved it was not made out of buttermilk, but it is not certain just what the reference to the buttermilk base was intended to convey to the prospective purchaser. It is said that the use of the word "buttermilk" in connection with the base was metaphorical

merely. The misrepresentation, if such it was, affords no ground for an injunction to plaintiff. The plaintiff prayed an injunction against switching prospective customers, but we find no error in the conclusion of the trial court that the defendant has the right to push (the sale of) its "Excella" face powder against the plaintiff's "Evening in Paris" face powder by way of honest representation and persuasion.

All points made in the very able brief for appellant have been given consideration, but we are not persuaded that the decree of the trial court should be reversed. "It has long been established by this and other federal courts that the findings of a chancellor on conflicting testimony are presumptively correct, and will not be overthrown, unless it is clear that some serious mistake has been made in consideration of the evidence. Tilghman v. Proctor, 125 U.S. 136, 149, 8 S.Ct. 894, 31 L.Ed. 664; Karn v. Andresen, 60 F.(2d) 427, 429 (C.C.A.8); Central Republic Bank & Trust Co. v. Caldwell, 58 F.(2d) 721, 734 (C.C.A.8); Coats v. Barton, 25 F.(2d) 813, 815 (C.C.A.8)." Norwich Union Indemnity Co. v. Simonds (C. C.A.8) 65 F.(2d) 134, 135; Klaber v. Lakenan (C.C.A.8) 64 F.(2d) 86, 90 A. L.R. 783; Woods-Faulkner & Co. v. Michelson (C.C.A.8) 63 F.(2d) 569; Conqueror Trust Co. v. Fidelity & Deposit Co. of Maryland (C.C.A.8) 63 F.(2d) 833; Clements v. Coppin (C.C.A.9) 61 F. (2d) 552.

The decree of the District Court is affirmed.