James C. O’Brien, J.
Plaintiff complains that defendants’ conduct constitutes unfair competition. Plaintiff seeks a permanent injunction and money damages.
The conduct complained of consists in the publication and wide circulation by both defendants of pamphlets explaining and promoting the “Monthly Investment Plan” (hereinafter called “ M.I.P.”). Plaintiff claims that certain statements contained in those pamphlets are false and derogatory and damaging to the plaintiff and that their publication and circulation constituted unfair competition; that unless defendants be enjoined, plaintiff in the future will suffer irreparable damage to its reputation and good will.
Plaintiff is a corporation of modest size (total 14 employees, of whom 9 are in the sales department and 4 in the office, plus plaintiff’s president). Defendant Merrill Lynch, Pierce, Fenner and Beane, hereinafter called “Merrill Lynch”, is a very large brokerage house with branches throughout the country. It has 117 partners of whom 72 are general and 45 limited. Defendant New York Stock Exchange (hereinafter called “ Exchange ”), has 650 members, of whom some 300 or *136 more, scattered over the United States, sell to investors under M.I.P. One such member is Merrill Lynch.
In 1938 plaintiff’s president, Mr. Quinby, commenced. the promotion of a plan for the accumulation of Eastman Kodak common stock, called ‘ ‘ The Quinby Plan ’ ’. The plan offered various features including the purchase of the security by means of modest periodic payments, the automatic reinvestment of cash dividends and the privilege of buying parts of shares. There are other features of The Quinby Plan which need not be mentioned at this time.
In the year 1951 Mr. Quinby sold the business to the plaintiff. In 1950 the plan was broadened by increasing the number of stocks available to an investor from one to two, later from two to four, and finally from four to six. At the times with which we are concerned, when the offending pamphlets were being prepared and published and circulated, the plaintiff offered, and currently offers, to an investor a choice of any one of six stocks.
In January of 1954 the Exchange published and both defendants extensively circulated a pamphlet, which was designed to and did promote and explain M.I.P. The booklet contained this language: “ New — the most significant new idea * * * in decades ”, “ a new personal investment program ” also: “ The plan opens a new era in the history of personal investment. For this new investment method offers you ”. It also says-: “ The monthly investment plan is simply a method of purchasing shares by the dollars ’ worth — just as you can buy $2, $3 or $5 worth of gasoline.”
In 1956 defendant Merrill Lynch also in addition prepared, published and extensively circulated another pamphlet which also was designed to and did promote M.I.P. This latter pamphlet contains statements to the effect that only under M.I.P. could an investor buy parts of shares, automatically reinvest cash dividends and by means of periodic payments avail himself of “ dollar cost averaging ”.
These (from both pamphlets) are the statements of which plaintiff complains which, it claims, have caused it loss of good will, prestige and income. It is urged that they disparage and are derogatory of the plaintiff and will cause plaintiff irreparable loss in the future.
Plaintiff contends these statements of defendants are false. We first examine this claim. In effect the statements claim that M.I.P. is novel and that it, alone, offers what cannot be obtained elsewhere, particularly stressing as novel and peculiar to it the three features already mentioned, viz.: small periodic *137 payments, automatic reinvestment of dividends and the privilege of buying parts of shares. It will be remembered that these three features are currently offered as part of plaintiff’s plan and have been so offered by it for many years before the advent of M.I.P.
Defendants urge that the substantial differences between M.I.P. and plaintiff’s plan justify the language used and that the M.I.P. is novel and that it does offer what cannot be procured elsewhere. In other words the defendants say that the statements in their pamphlets were in fact true. A few of these important differences: — M.I.P. offers a choice of some three hundred brokers through whom an investor can buy under M.I.P., a choice of approximately 1,200 stocks as against the plaintiff, as one dealer, and his offering of any one of only six stocks. M.I.P. charges an odd lot commission, higher pro rata than the plaintiff’s round lot commission. However, M.I.P. exacts no fee for buying other than the odd lot commission, whereas under plaintiff’s plan the investor pays a substantial sum for “sponsor’s and custodian” fees. Plaintiff provides a trust company as custodian of the securities and M.I.P. has none such. Accordingly in some important respects M.I.P. in fact is different from the plaintiff’s plan and to that extent it is new and does offer a combination of things which cannot be procured elsewhere. Nevertheless the statements complained of are certainly not wholly true because they do not tell the whole truth. To be completely truthful defendants probably should have stated with meticulous accuracy the respects and particulars in which their plan was new and the particulars in which it had adopted for use procedures which were already in use and not new. Then and only then would their statements be completely true, ethical and above reproach.
Assuming then that the statements of defendants were not completely truthful, do they constitute actionable fraud and unfair business competition or are they simply extravagant “ dealer ” statements? I have come to the conclusion that they fall within the class last mentioned. One never picks up a magazine without reading in its advertisements statements either of facts or opinion at least as extravagant and exaggerated as those which defendants’ pamphlets contain. Some of them could be mentioned as illustrations, particularly the statements put forth by distillers, importers, tobacco and cigarette manufacturers and others of the sort. Dealers have a way of extolling their own products to the buying public. Does the statement by a cigarette manufacturer that his cigarette “filters best”, by an automobile manufacturer that *138 no car other than his provides such a smooth ride, that his car is the only completely new car on the road, constitute false and fraudulent advertising? Viewing these statements as they would be read by a prospective buyer, I am inclined to think that they would deceive no one and that they are simply ‘ puff ’ ’ talk and so were the statements of the defendants. (See Dale System v. General Teleradio, 105 F. Supp. 745, 750; Zenobia Co. v. American Pistachio Corp., 168 Misc. 312, affd. 259 App. Div. 806, motion for leave to appeal denied 259 App. Div. 864; Lewyt Corp. v. Health-Mor, 84 F. Supp. 189, revd. in part on other grounds 181 F. 2d 855, cert, denied 340 U. S. 823; Anheuser-Busch v. Du Bois Brewing Co., 175 F. 2d 370, cert, denied 339 U. S. 934.)
Plaintiff offered no evidence that anyone had been misled by the defendants’ advertising. There is no proof that any investor had left plaintiff to go to defendants. It is difficult to see how defendants’ statements would lure a prospective customer from plaintiff into their hands. An investor who contemplates accumulating securities through small periodic payments logically is a possible customer of either M.I.P., the plaintiff or someone of the many mutual funds. The fact is that all of them offer these advantages which the defendants stressed in their pamphlets.
If the investor first approached plaintiff, the various features which are advantages of plaintiff’s plan might appeal and plaintiff would have him as a customer. If he rebelled at paying the ‘ front end load” (the fee of sponsor and custodian) he might take his business elsewhere, perhaps to M.I.P. or one of the mutual funds. What plaintiff urges is that the false advertising of defendants would prevent a prospect from approaching plaintiff in the first instance. I cannot agree. Investors are adult and not so ingenuous and gullable as plaintiff believes. There is no reason to suppose that an investor would not consider and weigh the advantages and disadvantages of all the plans and procedures of which he had knowledge, nor that he would be prevented from subscribing to the plaintiff’s plan by reason of the defendants’ advertising.
No evidence has been offered of any pecuniary loss to plaintiff on account of defendants’ advertising. His business has prospered. It may well be that the extensive advertising by defendants, of M.I.P., as well as the equally extensive solicitations by the various mutual funds of the small investor has made accumulation of securities by modest periodic payments more popular and better known. This, instead of hurting, may have helped plaintiff. In spite of the allegations in the com *139 plaint concerning damage to plaintiff’s prestige and good will, the proof shows that plaintiff has not suffered in these respects and there is no prospect that it will so suffer in the future.
It is true that in the limited geographical area in which the plaintiff carries on its operations, the defendants, through M.I.P., are its business competitors for the funds of small investors. Moreover although plaintiff contends to the contrary, I feel that so also are the mutual funds. The business of these funds has grown enormously; there are now some 160 such funds and they are continually increasing in number and there has been invested with them between $16,000,000,000 and $18,000,000,000. If plaintiff has sustained any loss in recent years, we cannot without further proof attribute such to the defendants ’ false advertising. It might well be the result of one or more various other factors, including the increased competition of the mutual funds. Plaintiff has failed to prove, and it is incumbent upon plaintiff to establish, that any loss it has sustained is causally related to the false advertising of which it complains. (Mosler Safe Co. v. Ely-Norris Safe Co., 273 U. S. 132; Bourjois, Inc. v. Park Drug Co., 82 F. 2d 468, 471; Electrolux Corp. v. Val-Worth, Inc., 5 AD 2d 216.)
Plaintiff’s claim that the offending pamphlets disparage or deprecate its plan is not borne out by the evidence. Defendants ’ praise of their product was somewhat extravagant, as has been said. However, there is no proof of any intention on the part of any of the defendants to hurt or damage the plaintiff or its plan, save only the fact that their seeking business from small investors to some limited extent brought them into more direct competition with the plaintiff as well as with the mutual funds. Nor should it be overlooked that it was established beyond dispute that the vaunted advantages of M.I.P., stressed in their advertising, were available to an investor not only through M.I.P. and through the plaintiff’s plan, but also through others, including most of the mutual funds.
Plaintiff contends that the mutual funds are not actually competitors of plaintiff because they offer a prorata share in a diversified list of securities, where as plaintiff and M.I.P. offer plans for the accumulation of a stock only. However, this is a narrow view in my opinion. I conclude that all three of them, plaintiff, M.I.P. and the mutual funds, are in actual competition for the dollars of the small investor.
Also we recall that the part of the advertising of the defendants, to which the plaintiff objects, does not stress that M.I.P. offers the investor the right to accumulate a single stock by periodic payments rather than a cross section of a list of secur *140 ities which is available through the mutual funds. The defendants’ advertising is objectionable to plaintiff because it, so plaintiff claims, leads a prospective customer to believe that the opportunity to buy, by small periodic payments, is new; that the opportunity to avail himself of dollar cost averaging, by making larger payments at intervals, is novel, and that the purchase of parts of a share and the automatic reinvestment of dividends is peculiar to M.I.P. Since all these privileges and advantages are also offered by the mutual funds as well as by plaintiff, the advertising, therefore, was as much a disparagement of the funds and others as of the plaintiff.
The proof demonstrated that each one of these stressed advantages was in common use before the plaintiff’s plan was first offered and the plaintiff knew that fact. None of them originated with the plaintiff. He used them to good effect but he was not the author of any of them. It will be noted also that none of the advertising mentions the plaintiff’s name nor its plan nor does it, even by inference, refer to the plaintiff or its plan. In no way that I can see did the advertising disparage plaintiff or deprecate its plan.
The Quinby Plan was extensively advertised in many articles. These articles were commendatory and explained the operation of the plan. Many of them were published before the defendants’ pamphlets were prepared and circulated. By reason of this fact and the extensive general dissemination of information about the plaintiff’s plan which thereby resulted, and the correspondence between plaintiff and employees and officers of the defendants and by reason of other evidence adduced at the trial, I am warranted in finding, and I do find, that at the time (Summer of 1953) when defendant Exchange prepared its plan (M.I.P.) and put it into effect and published the offending pamphlets (Jan., 1954), its officers had learned of plaintiff’s plan and were, at least in a general way, familiar with its operation. It is not so clear that defendant Merrill Lynch had such knowledge. However, I believe that at least one of the partners of that firm, viz.: Mr. Engel, had known at one time, at least, of the plaintiff’s plan; whether or not he had its features in his mind when he prepared the supplementary pamphlet, I do not know. In any event it seems logical, even probable, that both defendants should have canvassed the field before they published and circulated their pamphlet. Therefore they should have been acquainted with the various plans, procedures and devices then in effect for the accumulation of stock by periodic payments, at the time that they prepared and published their respective pamphlets. I am still convinced that they did not *141 intend to direct their efforts against the plaintiff. Had they so intended, no doubt they would have inserted in their pamphlets statements and arguments tending to show that plaintiff’s plan was defective, more costly, limited in scope to a small number of securities, or in some other respects inferior to the plan which they offer. They did not do so and I do not believe that they had in mind any hostility to plaintiff’s plan but only a desire to extoll their own product.
Although plaintiff’s learned counsel, in a voluminous brief, has cited many cases, I cannot find any of them which would warrant the granting of an injunction against the defendants nor the awarding of damages to the plaintiff. Some of the cases cited by counsel will be discussed. One group cited consists of cases in which defendant in one way or another was trying to palm off on the public his goods, as those of the plaintiff, e.g., Ronson Art Metal Works v. Gibson Lighter Mfg. Co. (3 A D 2d 227); Dior v. Milton (9 Misc 2d 425); Westcott Chuck Co. v. Oneida Nat. Chuck Co. (199 N. Y. 247). Another group consists of cases in which the defendant was guilty of unfair business competition by an unauthorized or confusing use of the name of the plaintiff, e.g., Mumford Molding Mach. Co. v. Mumford Co. (88 N. J. Eq. 178); Westphal v. Westphal’sWorld’s Best Corp. (216 App. Div. 53, affd. 243 N. Y. 639). Besides these many cases, plaintiff cites another “ name ” case which is in a slightly different category, viz.: Cornell Univ. v. Messing Bakeries (285 App. Div. 490, affd. without opinion 309 N. Y. 722). This was a case in which the defendant, a specialized baker, was putting on the market, bread which he manufactured according to a formula evolved by a professor of Cornell University, and by that institution offered to the public. Apparently the University did not insist on a complete suppression of its name or its connection with the formula. It did insist that the use of its name should be limited and made subordinate to the name of the baker; that there should not be on the loaf or a wrapper, a pennant such as that used by the University or its students. The court held that although the plaintiff was not engaged in commerce or in business for profit, it did have a right to prevent the exploiting of its name for business purposes. It had gained prestige by hard effort and high cost and was justified in preventing the dilution of that prestige by the use of its name in connection with a commercial enterprise. One other out of the ordinary case cited by the plaintiff might also be commented upon, viz.: Pendleton v. Time, Inc. (339 Ill. App. 188). This was a case in which the plaintiff was a noted portrait painter. He had achieved the *142 distinction of being the first artist to have painted a portrait of Mr. Harry Truman, President of the United States. The magazine sought to secure his permission to reproduce his portrait. The permission was not forthcoming. Thereupon the magazine published another portrait which was falsely stated to be the first portrait painted of President Truman. It was held by the court that this conduct by the defendant was actionable because the plaintiff’s prestige, as an artist, was damaged or diluted by the false statement that someone other than he had been the first to paint such a portrait. It must be remembered, however, that he was the first to paint the portrait and without an extensive discussion as to other differences between our case and the Pendleton case, suffice to say that neither Mr. Quinby nor the plaintiff company was the first to offer the three advantages or privileges stressed in the offending booklets. Nor did the plaintiff have a property interest in them, as was the situation in the case of Dior v. Milton (9 Misc 2d 425), cited above. Another group of cases are those where an action is maintained under the Fair Trade Act, such as Bristol-Myers Co. v. Picker (302 N. Y. 61). Finally and most numerous are the cases in which the defendant was enjoined or cast in damages by reason of conduct which was found to have been intended deliberately to damage and hurt the plaintiff, e.g., Black & Yates, Inc. v. Mahogany Assn. (129 F. 2d 227); Allen Mfg. Co. v. Smith (224 App. Div. 187); Old Investors and Traders Corp. v. Jenkins (133 Misc. 213, affd. 225 App. Div. 860).
By reason of the differences between the facts in our case and the facts in the cases cited by plaintiff, I do not feel warranted in granting either injunctive relief or damages. The complaint should be dismissed, without costs.
This is my written decision, signed and filed pursuant to section 440 of the Civil Practice Act.
A proposed judgment may be presented for signature by counsel for the defendants and should bear indorsed upon its margin a written approval of its form by plaintiff’s counsel. In default of the securing of such written approval, the form of judgment will be settled on five days’ written notice.